(SMITH, C. J., dissented.)
The defendant is the sheriff of Hertford County, and the plaintiff brings suit on his bond to recover damages, alleging that defendant, having an execution in the case of Wynne v. Brown (the plaintiff in this action), wrongfully took possession of certain goods and chattels of Elizabeth Brown (the feme plaintiff in this action) and converted the *Page 274 
same to his own use; and that the property, at the time of the seizure and conversion, was worth $750
The defendant denied the alleged conversion, and for further (349) defense, says that the sale of said property by Frank Brown to his wife Elizabeth was fraudulent and void, and made to defraud creditors, especially the plaintiff in said execution; and that said Elizabeth accepted the sale with notice of the fraudulent intent.
This action was begun in the name of the State, on the relation of Frank Brown, etc., and was amended, as hereinafter stated.
The following issues were presented by the defendants:
1. Did Brown continue in possession and control of the property in question after the making of the bill of sale as before?
2. Was it the understanding between Brown and his wife that the execution of the bill of sale should be kept secret, and did they keep it secret until Wynne warranted Brown?
3. Did Frank Brown execute said bill of sale to his wife with intent to hinder, delay, and defraud any one of his creditors?
4. Did Mrs. Brown have notice of her husband's said unlawful intent?
5. Were the acts and conduct of Frank Brown, accompanying the execution of the bill of sale, such that Mrs. Brown might and ought to have drawn the inference of his said unlawful intent?
6. Was it any part of the purpose of Brown and wife, in executing said bill of sale, to hinder, delay and defeat Wynne, or any other creditor of Brown, in collecting his debt against Brown?
The presiding judge declined to submit any of the foregoing issues proposed to the jury, and defendants excepted.
The following issues were submitted to the jury:
1. Was the plaintiff, Mrs. E. Brown, the owner of the property described in the complaint?
2. Did the defendant, James S. Mitchell, wrongfully seize and (350) convert the same?
3. What is the plaintiff's damage?
The defendants excepted.
The plaintiffs offered in evidence a bill of sale from Frank Brown to Elizabeth F. Brown, his wife, which purported to convey the property in dispute.
W. T. Brown, a witness for the plaintiffs, testified: That he is not related to the plaintiffs; that he wrote the bill of sale; that he does not remember whether he was called upon to make any calculation as to the amount Frank Brown owed his wife; something was said about what he owed her; it was said to be money he owed her for her land and other things. *Page 275 
On cross-examination, witness testified that he thinks he wrote part of it at Murfreesboro, and part of it at his (witness') house. Frank Brown was present at Murfreesboro when witness wrote part of it; it was at his (Frank Brown's) house. Witness does not remember what part of it he wrote there; does not remember whether Mrs. Brown was present or not. Frank Brown named to witness several times about owing Colonel Wynne; not before witness wrote the paper. He came to see witness several times about it; witness does not remember his wife being present, and his talking about owing Colonel Wynne; witness heard him speak of the peanuts; witness finished the paper at his own house a day or two before he carried it back; witness does not know who was at his house then; does not think Frank Brown was there. Witness saw some of the furniture, horses, etc., at Frank Brown's place, when witness wrote the first part of the bill of sale at Frank Brown's house; witness gave the paper to Frank Brown, but he does not know where he (Frank Brown) wanted the paper written; he said he owed his wife. Witness thinks the paper bears the true date; witness thinks he was at Frank Brown's house when he signed the bill of sale, but don't remember now who was there; he thinks that it was in the room next the (351) street; that Frank Brown and his wife were present, and that he said that it was not worth while to say anything about it at that time; that he did not want it known. Witness does not remember that he said he did not want it known until Colonel Wynne and other creditors got after him; witness is not certain about it; he did not think or care much about it; witness heard about Frank Brown's not thinking he was treated right about the peanuts by Wynne so often, witness does not know exactly what he did hear.
On the redirect examination, witness testified that all the conversation about the peanuts was after the transaction (of the bill of sale), or most of it.
Frank Brown testified for the plaintiff: That, at the time of the execution of that paper, he owned the property therein described, the same as that described in the complaint. He conveyed to his wife all the horse he owned at the time (except a gray filly); a gray stallion, $300; a bay horse, $62; a bay mare, $100; a bay colt, $75; a black mare, $125; a buggy, $30, and a sulky, $30.
Witness was indebted to his wife about $750, money she loaned him. She sold her land that her father gave her for $1,000, and the timber off of it for $187.50; the timber was sold about eleven years ago; the land nine or ten years ago. Witness promised her faithfully when she loaned it to him that he would pay her back. Witness sold a lot in Murfreesboro and paid her $1,000, near four years ago. The difference between what witness owed her and what he had paid was the interest at 8 per *Page 276 
cent. She was after witness several times to pay her, and witness did convey her the property to pay her. Witness conveyed to her all of the horses he had, except a gray filly, which he afterwards sold to his brother-in-law, all the buggy and sulky he had, and all the furniture.
Cross-examined: Witness testified that the gray stallion was (352) worth $300 at that time. Witness gave the paper to his wife, and she put it away; witness delivered the property to her; some of it was at the plantation, and some was at home; the gray horse and the sulky were at home, and also the furniture and the buggy; the cows were in the field at the Wilson farm, near Murfreesboro, of which the witness was in possession, under a contract of purchase; there was a mortgage on it. Witness worked the work-horses on the farm, and kept the property over there, and went backwards and forwards, just as before; witness told that it was his wife's and never offered to sell any of the colts; he might have, but is not certain. Witness thinks this paper was registered about November, 1886; about the same day that Wynne warranted witness; it was in the night at nine or ten o'clock; witness found the clerk of the court at home in bed, and got him up to get him to record it; it had been in Mrs. Brown's possession all the time. The debt to Wynne had been contracted the year before for supplies; witness did not think he owed Wynne much; he had witness' peas in his hands. Witness does not know that he did tell anybody about it after he had this paper executed; witness don't think that he swore that no one knew anything about it but himself, his wife, and Tom Brown; witness did not tell Wynne and the other creditors, because it was not his business to tell them; witness did say, on his cross-examination before the commissioner, that he would have been a pretty fool, or you must think me a fool, to have told them; witness said he delivered the property to her, and then used it as her property, and used it as he did before. The gray horse was then in her possession; witness delivered the horses to her as they stood in the stable; witness can't tell here where in the house they were; witness gave her the paper and told her the property was hers; the gray horse (stallion) stayed in the stable till the first of March; witness sent him round in his own name, as agent for his (353) wife, and made the entries in the horse-book in his own name, and warranted persons for the stallion's services after the bill of sale in her name; where the service was performed before the bill of sale, witness warranted in his own name; witness listed the property afterwards in his own name, and expected to pay the taxes. Witness traded a little while with Colonel Wynne after making the bill of sale, and did not tell him about it; traded at other places also, and did not tell any one about it; witness owed his wife $1,187.50, and interest run it up; witness did not give any note to his wife for it, but promised to *Page 277 
pay her 8 per cent; witness don't think he took any receipt from her; witness thinks Worrell paid him $187.50 for the timber on his wife's land, and ______ paid for the land at the house of witness and wife, nine, ten or eleven years ago.
Cross-examined: Witness said that when the property was sold by the sheriff, Mr. Brewer bid in most of it for witness' wife; she bid in the gray horse at $100, the sulky at $11; brother bid off the two colts for witness' wife, the black one for $80, the other for $43; Brewer took them and paid for them. After witness got the money from his wife he paid Vann, who had loaned him the money to pay for the Gatling place, and when he sold the Gatling place he put the money received from it in the Wilson farm; witness sold $600 worth of lumber off of the Gatling farm, and paid a part of it for a lot in town, of which he wanted his wife to take the title, but she said no; she wanted to have the title for the Wilson farm when he finished paying for it; witness failed to pay for the Wilson farm, and she insisted on his making her a conveyance for the lot in town, which he did; witness consented at the time that she should have title for the Wilson place when paid for. These papers in the handwriting of witness. Witness' wife went to the Wilson farm a few times; she knew the property as well as witness did.
On the redirect examination, witness stated that he gave $800 (354) for the lot in town, and sold it to his wife for $1,000; Mr. Smith took back the Wilson farm; witness did not think he owed Wynne over $100; witness had ninety bags of first-class peanuts, and seventy-five of other quality, in Wynne's hands, and he promised witness he would hold them; he sold them and got very little for them; Mr. Vaughan got nearly as much for forty-five bags as Wynne did for all witness' peanuts; witness and his wife have continued to live together all the time.
The plaintiff rested, and the defendants offered evidence:
Mr. Deloatch testified: That before Wynne warranted Frank Brown, in 1886, witness went over to F. Brown's to buy a horse; he offered to sell witness the black colt, and did not say anything about its being his wife's; witness don't know who was in the possession of this personal property; part of it was on the Wilson farm, which Frank Brown was cultivating; don't know who sent the horse round.
Colonel Wynne testified: That the debt was an account in the store for family supplies generally, goods and merchandise, and witness credited Mr. Brown; it was considerable of an account, as much as witness thought ought to be upon the amount of work he was doing; witness assisted him, and about the end of the year he was to deliver his crop in the payment of the account; he did deliver more or less from time to time; he was not as active as witness thought he ought to be, and witness told him; witness would always insist on his giving directions as to the *Page 278 
disposition of the crop delivered by him, and he would always say, "Colonel, do just as you think right"; the peanuts were all to be delivered to witness; he told witness he could not get hands; witness said to him, "If you will give me control of your crop, I will provide hands"; he said, "I will satisfy you"; witness paid his hands for picking his peanuts; witness ascertained that he was letting other parties (355) have the peanuts; he admitted it afterwards; witness shipped the peanuts delivered to him with Brown's knowledge, and thought they brought a fair price; witness insisted on a settlement, and took from him three notes, amounting to about $387.42. Frank Brown was in possession of this property before and after 1 January, 1886; there was no change of possession to witness' knowledge; witness was doing business with him all the time, and never was advised of the bill of sale to his wife; he spoke of the property as his own; witness had no notice of the bill of sale; witness supposes that Mrs. Brown knew of her husband's indebtedness to witness; the family were in the store trading; the peanuts were sold late in the winter; he was farming before and after January, 1886; he and his wife were living together at Murfreesboro; that is all witness knew of the possession; witness thought the house and lot was his until this development. After the making of the bill of sale he continued to trade with witness until the spring of 1886, about the time he gave witness the notes.
The defendants' counsel proposed to ask witness these questions:
Would you have given credit to Mr. Brown if you had known of the execution of the bill of sale?
Plaintiffs object. Objection sustained. Defendants except.
Did you think Brown was the owner of the property at the time you gave him the credit?
Plaintiffs object. Objection sustained. Defendants except.
I knew of no disposition of the property at all by Brown. I don't remember the exact amount the property sold for at sheriff's sale; it lacked about $175 of paying the debt due to witness. The gray horse is worth $150 or $175, probably $200; it is a nice-looking stallion, rather under size. Mr. Brown stated at the sale that Mrs. Brown claimed the property.
(356) Dr. Gatling testified that he was clerk of the Superior Court in November, 1886, and remembers Frank Brown coming and waking him up late at night; witness went to the window and took the paper, between 10 and 11 o'clock p.m.; he wanted it proved for registration.
W. B. Spencer was offered as a witness for defendants, and counsel for defendants proposed to examine him as to what Frank Brown swore before him (Spencer) on the taking of said Brown's deposition — counsel *Page 279 
having the deposition in his hand — and that witness be permitted to use the deposition to refresh his memory.
Objection by plaintiffs. Sustained, and defendants except.
The deposition was then proven and read for the purpose of contradicting Frank Brown.
The defendants offered in evidence abstract of the tax-list for Frank Brown in Mauney's Neck, 1886, which showed that horses, cattle, hogs, farming utensils and household furniture were listed in the name of Frank Brown.
Defendant closes.
The plaintiff offered the tax returns of Frank Brown in Murfreesboro Township for 1886, which show a residence listed in Frank Brown's name.
A deed from Frank Brown to his wife, 5 February, 1885, for town lot in Murfreesboro.
This was objected to by defendant as immaterial and irrelevant. Objection overruled. Defendant excepted.
Mrs. Elizabeth Brown testified that she was a plaintiff, and wife of Frank Brown; that she owned the property in dispute at the time of the seizure; it belonged to Frank; witness don't know exactly when he conveyed to her; this is the bill of sale dated 1 January, 1886; witness loaned him the money; sold her land for $1,000, and her timber for nearly $200, and loaned it to him to finish paying for the Gatling place; he promised to refund the money to make it good; he conveyed the house and lot in Murfreesboro to witness at $1,000; witness (357) did not take it at first, because she was not satisfied with it; in addition to that, he owed witness the principal, about $1,200, besides interest, when he conveyed the house and lot in town; the father of witness gave her the land; Tom Brown wrote this paper, and witness' husband gave it to her; she took it, put it away, and kept it; did not register it, because her husband told her he had consulted those who knew, and they said it was not necessary.
Defendants objected to last statement of witness. Objection overruled, and defendants excepted.
Henry _______ bought witness' land and paid the money; he handed Frank the money; Frank handed it to witness, and said he would like to borrow it to finish paying for the Gatling place; witness told him that she had no objection, provided he would make it good to her; Frank told her he had the money for the timber, and if she would let him have it to finish paying for the Gatling place he would make it up to her, and witness agreed to let him have it on that condition; at the time this bill of sale was given to witness, she did not know that her husband was insolvent. (Objected to by defendants.) Did tell several other people *Page 280 
in town; did not try to keep it secret; was in her sitting-room when he gave it to her; she put it away, and that was all that was done with it; she told him to list the property; she spoke to Judge Barnes a year or so before the bill of sale; her intention to take the Wilson farm in her name, but finding he was not going to pay for it, Judge Barnes advised her to take the house and lot in Murfreesboro and personal property for the balance; he promised to refund it to her when she loaned it to him; he said he would pay 8 per cent; it was mentioned when the bill of sale was written; the income from the gray horse was paid to him, and he would bring it home and pay it over to witness; and she would spend it or tell him to use it to the best advantage; she gave him the (358) privilege of using it for the family; when he made her the bill of sale, she did not tell him he should not have the profits from the horse; she consented for him to use it, and to use the horses on the farm to the best advantage; she told him that some of the stock was an expense, and she wished he would sell it. He afterwards sold the Gatling place and bought the Wilson place, and paid half down, $2,000, on the ground that it was immaterial whether she knew it or not.
Objection overruled, and defendants excepted.
Witness knew that he had a running account with Wynne, but thought the peanuts would pay it; her only purpose in taking the bill of sale was to protect herself; she spoke of it several times; she sent for Judge Barnes to have the matter fixed; she spoke to her husband several years before this about it; she was told by Judge Barnes if she was not willing to take the house and lot, to let him sell her enough of his personal property to pay the debt.
Objected to by defendants. Objection overruled, and defendants excepted.
Witness spoke to Judge Barnes and to Frank when he did not owe a dollar in the world, that she wanted him to make her money safe.
Cross-examined: Witness testified that she and her husband lived together in 1885 and 1886; the property was kept first on farm and then over in town, backwards and forwards; he used the work-horses in cultivating the farm; witness gave him the privilege to do that; it was necessary for the support of the family; he used it as he did before witness gave him permission; witness knew he had an account with Colonel Wynne; witness traded there, and did not tell Colonel Wynne about it; she consented, provided he would make her safe; she supposes he took the papers in his own name; she did not raise any objections; he promised that when he finished paying for it, it should be in her name. (359) Redirect: He paid no rent; his family and her family were the same. *Page 281 
The defendants asked the following instructions, which were not given, and defendants excepted:
1. That if it was any part of the purpose of Brown and wife, when said bill of sale was executed, to transfer the property of Frank Brown to his wife, in order to keep his creditors, or any one of them, from collecting their or his debt then the bill of sale is fraudulent and void, and they should find for the defendant.
2. That if it was any part of the understanding between Brown and his wife, when said bill of sale was executed, that Frank Brown should continue in the possession and use of the property mentioned in the bill of sale, or any part thereof, as before, then in law said bill of sale was fraudulent and void as to the creditors, and they should find in favor of the defendants.
3. If it was any part of the purpose of Brown to place his property beyond the reach of his creditors, and that unlawful purpose was brought to his wife's notice, either directly or indirectly, or by circumstances, then she is a participant in the fraud, and derives no title to the property under said bill of sale to the prejudice of her husband's creditors, and this is true even if Brown was indebted to his wife, as stated.
4. If the acts and conduct of Frank Brown attending the execution of the bill of sale were such as his wife might, and ought to have drawn the inference of fraud and of his fraudulent intent, she is fixed with notice of the fraud, and she cannot hold the property against the demand of the creditors of her husband.
5. That if it was any part of the understanding between said Brown and wife, at the time said bill of sale was executed, that the making said bill of sale was to be kept secret, and not to be made known, unless in case of his financial embarrassment, and it was kept secret, and Brown continued to use and possess the property as before, that would amount to a secret trust for her husband, and in law would be (360) fraudulent and void as to creditors, even if he were justly indebted to her, as stated.
6. That after Brown executed said bill of sale, if he continued in possession of the property as before, the law presumes that the sale to his wife was fraudulent as to his creditors, and throws the burden on Mrs. Brown of showing the contrary.
7. The law regards with suspicion all conveyances between husband and wife, when they conflict with the rights of creditors, and raises the presumption that they are fraudulent, and compels those claiming under such conveyances to show that they were fair, honest, and free from any intent to defeat, hinder or delay creditors in their rights.
8. And even if there were no fraud in the transaction, then the bill of sale would not pass the title to Mrs. Brown, unless it was accompanied *Page 282 
by a delivery of the possession or control of the property; and if Frank Brown continued in the possession of the property, claiming and using it as before, then there was not a sufficient delivery, and no title passed as against creditors of Brown.
9. If the bill of sale was intended as merely a security for a debt due Mrs. Brown, and no release of the debt was executed at the time of the bill of sale, which indicates that it was a security, then the bill of sale cannot operate against creditors, either as a mortgage or absolute conveyance, and no title passed to Mrs. Brown as against the creditors of her husband.
10. If you believe all the evidence, the plaintiffs are not entitled to recover.
11. That if you find that the feme plaintiff is the owner of the property, and that the sale from her husband to her was not tainted with an unlawful purpose, as the court has charged you, then she can only recover the value of the property at the time of the sheriff's sale, (361) with 6 per cent interest; but if she became the purchaser of any of the property at the sale by the sheriff, for that she can only recover the amount of her bid, with interest at 6 per cent.
12. That if the feme plaintiff appeared at said by the sheriff, either in person or by agent, and objected to the sale of the property, and claimed it as hers, and then by her agent bid at the sale of the property by the sheriff, this is a badge of fraud, and you may consider it in passing upon the question of title or ownership.
13. The court further charges you that if the feme plaintiff, Mrs. Brown, appeared by her agent at said sale and objected to the sale of the property and claimed it as hers, and then by her agent bid at the sale of the property by the sheriff, she is estopped from afterwards setting up title to said property.
14. The fact that Frank Brown owed his wife a just debt is immaterial, if it was any part of the purpose of Brown and wife, at the time of the execution of the paper, to so place the title of said property that Brown's creditors could not reach it for their debts.
15. The law views such transactions as the one involved in this cause between husband and wife with suspicion, and whenever they conflict with the rights of creditors it requires the parties to them to show that they were not intended to defeat creditors. The law likes fair dealings, and hates fraud of all kinds, and juries should be rigid in compelling fair dealing between parties.
The presiding judge instructed the jury as follows:
"This action is brought by Mrs. Brown against Sheriff Mitchell, to recover damages from him for the conversion of certain personal property which he seized and sold, under execution in favor of Colonel *Page 283 
Wynne against Frank Brown, and which Mrs. Brown says was her property, and not her husband's. The firs issue presented to you is, "Is the plaintiff. Elizabeth, etc." Several questions will present themselves for your solution, to enable you to reach the answer (362) to the issue. There is no question but that this property did belong to Frank Brown, and that on 1 January, 1886, he executed a bill of sale of the same to his wife, and, according to the testimony, the property, part of which was at their home in Murfreesboro, and part on the farm of Mr. Brown, was used as it was before, by the husband — the horses upon the farm, in the cultivation of the farm, for the benefit of the family of Mr. and Mrs. Brown, and that the husband used the horse which was at their home in Murfreesboro, a stallion, and would pay over to his wife the money made by the use of the horse, or that she authorized him to use the same for their mutual benefit. If there was no delivery of the property by the husband to the wife, the sale was not complete, and the property never did pass to the wife, and the sheriff had a right to levy upon and take it as the property of the husband, and your response should be, `No, the plaintiff is not the owner, etc.'
"A delivery may be actual, as the absolute transfer of the possession of the property by the vendor to the vendee; or it may be constructive, which is something that amounts to a delivery of the thing sold — a delivery of a bill of sale, the property not being present, with authority to take it when it comes within reach of the vendee, and a consequent abandonment of possession or claim on the part of the vendor; or a symbolical delivery, as the delivery of a key to the house in which the goods are stored. It is not claimed that there was an actual manual delivery by Mr. Brown, and taking possession by Mrs. Brown, of the property described in the bill of sale, nor a symbolical delivery of some article to represent the whole, but it is contended that it was a constructive delivered; that Mr. Brown handed here the bill of sale and told her the horsed were hers, and she told him to take it and use it for their mutual benefit, and that he did thereafter to hold it. If there was no transfer of possession, no delivery of the property, but the vendor (363) remained in possession, using the property as his own, just as he the vendor, Frank Brown, there was no transfer of title, but it remained in the vendor, and the property, being still in his possession, was subject to levy and sale under execution as his property.
"It is not contended that there was an actual delivery of the possession. The testimony of the husband is that he gave her the bill of sale, and told her the property was here. Some of the property was at the stable at their home in the town, and some was at the farm in the country, which was worked by the husband. Mrs. Brown testified that *Page 284 
she gave him permission to use the horses in working the farm, for the support of the family, and to use the stallion, which he did, and brought her the money, which she would take, or tell him to use for the best advantage.
"Now, if the testimony satisfy you that Mrs. Brown accepted the bill of sale, and gave her husband authority to hold the property as her agent, they living together, and he using the property as hers, and for the benefit of the family, according to her directions, this would be a constructive delivery.
"If you have been satisfied that there was a constructive delivery, was it a bona fide sale by husband to wife? The law looks with suspicion upon a transaction of this kind, where the husband is indebted to others and conveys his property to his wife for the alleged purpose of paying her, or securing to her an indebtedness owing by the husband to the wife, and you are required to scrutinize the matter closely in reaching your conclusion as to its validity.
"Was there an indebtedness by the husband to the wife? You have heard the testimony of both husband and wife on this point.
"If they have satisfied you, by a preponderance of evidence (364) that there was an actual debt owing by husband to wife, he had a right to pay or to secure to her the debt. And, if owing her a valid debt, he transferred and delivered to her his personal property with the sole purpose of paying her, or securing to her the payment of the indebtedness, in such case the wife got a good title to the property, and the sheriff had no right to seize the same as the property of the husband; or if he owed her the debt, and in consideration of the same, conveyed to her personal property, not being in value more than the debt, even though he may have intended to hinder and delay, or defeat, his creditors by this conveyance, yet, if this intention was unknown to and not participated in by the wife, it would be a valid sale, and would convey the property to the wife.
"But if the husband was indebted to others and also to his wife, and with the intent to hinder, delay or defeat his other creditors, he conveyed and delivered his property to his wife in payment of a debt which he owed to her, if she participated in this design of his, or even if she knew that it was being done to hinder the other creditors, or delay them, the conveyance to her cannot stand.
"And if you have found that there was a sale perfected by a delivery, it hinges upon this question, was it done to hinder or delay the other creditors, and did she participate in this purpose, or even know of it? And, to enable you to determine as to the truth of this matter, you must look with suspicion upon the transaction and scrutinize it closely. You will consider all the testimony. Was he permitted by her to continue *Page 285 
in possession and use it as before the sale? Was the transaction kept secret, especially did she keep it secret, or know of its being kept from the knowledge of her husband's creditors until he was pressed by another creditor? Was the bill of sale kept by Mrs. Brown until her husband was pressed by another creditor, and then was it taken by her husband and carried to Winton and acknowledged by him before (365) the clerk, and delivered by him to the register of deeds in the night-time? You must remember also the testimony as to explanations given by the vendor and vendee. You must consider these matters, and all others which have been brought to your attention by the testimony, and if they have not satisfied you of the completion of the sale by a delivery, or that it was a bona fide sale by husband to wife to secure or pay a debt then existing, or if it was to secure such debt, if it was intended to hinder or delay other creditors, and this purpose was participated in or known by Mrs. Brown, your response should be, `No.'
"If you should respond `No' to the first issue, you need not trouble yourselves about the others.
"But if you shall find that it was a bona fide transaction, that there was such a delivery as the law recognizes and as I have explained to you, that there was no intention participated in or known to Mrs. Brown to hinder or delay the other creditors of Mr. Brown, your response should be `Yes.'
"If `Yes' to the first issue, it should be `Yes' to the second, and the damages would ordinarily be the value of the property taken, with six per cent interest from the taking. If, however, Mrs. Brown bought in any of the property at sheriff's sale for less than its value, the damages as to that property would not be its value, but what she paid to get it back.
"To arrive at the value of the property, you may consider all the testimony on that subject, the price for which any of it sold about that time; while it is not to control you in your view of its value, yet it is to be considered by you with all the surrounding circumstances of the sale. If Mr. Brown owned two by colts and only attempted to convey one of them, without giving a description of the colt, so as to enable you to distinguish between them, it did not convey one of the colts. So you will leave out the value of the colt in estimating damages."
The defendants excepted to the charge as given. (366)
There was a verdict for the plaintiffs.
After verdict, plaintiffs moved to amend by striking from summons and complaint the words "State on relation of," and to enter a nol. pros. as to all the defendants except J. S. Mitchell. Defendants objected.
Motion allowed, and defendants excepted. *Page 286 
The plaintiffs then moved to amend their complaint in conformity to the above amendment. Defendants objected.
Motion allowed, and defendants excepted.
Rule for new trial for errors alleged, and for amendments.
Rule discharged.
Judgment for plaintiffs, and defendants appealed.
There was a motion by defendant, in the Supreme Court at this term, for a new trial, on the ground of newly discovered evidence.
When a party to an action moves in the Superior Court, before the end of the trial term, for a new trial, on account of testimony discovered after the rendition of verdict, the motion is addressed to the sound discretion of the presiding judge, and, if he rests his refusal to grant it solely upon his discretionary power, his decision is not reviewable in the appellate court. Carson v. Dellinger,90 N.C. 226. So, where a party moves for a new trial in the Supreme Court, on the ground that he has discovered, since the expiration of the trial term below, new and material evidence, that he could have the benefit of on a future trial, the higher Court exercises a purely discretionary power in passing upon the motion. We therefore deem (367) it proper to give notice, that this Court will, as a rule, in future, grant or refuse such motions without discussing the facts embodied in the petitions or affidavits of the moving party, as we cannot see that any good will be accomplished by contributing another to the volumes that have been written upon the exercise of legal discretion in deciding questions raised by applications for new trials. In this case, however, we find, that the new testimony which the defendant proposes to offer is intended only to contradict the feme plaintiff as to her alleged declarations to the witness. The testimony in chief is not separated in the statement from that elicited by cross-examination; but it may be, and indeed it seems probable, that her testimony on that point was given in response to a question from defendant. We can readily see how, if the motion were granted, and acted upon as a precedent, a majority of defendants in cases like this might lay the foundation for a new trial, by asking one charged with being a party to a secret fraudulent conveyance, to whom the witness communicated the fact that it was executed, and then proposing by some of the persons named in reply to contradict on a future trial. The proposed new testimony, as to the collection of fees for the services of the horse, would be offered confessedly to contradict statements made by the husband on cross-examination. The *Page 287 
general rule is, that, when the new testimony will tend merely to contradict a witness examined on the trial, a new trial will not be granted the party wishing the benefit of it. Hilliard on New Trials, ch. 15, sec. 19; Graham and Waltman on New Trials, 498.
The defendant excepted to the refusal of the court below to submit the more numerous and specific issues, tendered on his part, and the substitution of those passed upon by the jury instead of them.
The judgment can be predicated upon the facts found by the jury, as set forth in the record. It does not appear that the defendant was denied the opportunity to have the law applicable to any material portion of the testimony fairly presented and passed upon by the (368) jury, through the medium of some one of the issues submitted.Emery v. R.R., ante 209. The exception cannot therefore be sustained.
The defendants insist that there was error in the refusal to give the instructions asked, numbered 6, 7, and 15, involving the question whether, upon the evidence, the court should have told the jury that there was a presumption, not only that the wife had not paid bona fide for the property assigned to her by her husband, but that a transaction of the kind between husband and wife cast upon the plaintiff the burden of rebutting the presumption that it was fraudulent.
The doctrine of the burden of proof, in its application to causes involving an issue of fraud, has led to their division into three classes (Hardy v. Simpson, 13 Ired., 132): First, when fraud appears so expressly and plainly upon the face of the deed as to be incapable of explanation by evidence de hors (as when it is manifest, from reading a conveyance, that it was made and was intended to secure the ease and comfort of a debtor embarrassed with debt at the time of its execution), there is conclusive presumption of fraud, and the court, without the intervention of a jury, declares the deed fraudulent. Second, when the law raises a presumption of fraud because of the relation of the parties to a transaction, or the circumstances attending it, and if rebutting evidence is offered the issue must be left to the jury. But in the absence of such testimony, the court acts upon the presumption, as when a person stands in certain fiduciary relations to others, such as arise out of reposing trust in his skill and integrity. The law raises a presumption in any transaction between the parties, that the party in the superior position has used it to the injury of the person in the inferior position. Bigelow on Fraud, 190; Lee v. Pearce, 68 N.C. 76;McLeod v. Bullard, 84 N.C. 515; Kerr on F. and M., 385 and (369) 386. Among the other cases classified under this head, are those in which a conveyance seems (nothing more appearing) to have been made for the ease and comfort of the debtor, but in which it is evident that some explanation might be given, and a different purpose and *Page 288 
intent might be shown. Hardy v. Simpson, 13 Ired., 132. Third, as a general rule, where there is only evidence of such circumstances as naturally excite suspicion as to the bona fides of a transaction the issue involving the question as to its fraudulent character should be left to the jury, with instructions that such circumstances are badges of fraud, and should be scrutinized closely in passing upon the issue. Among these badges, as enumerated by the courts, are failure to register a conveyance required by law to be registered, within a reasonable time after its execution; the embarrassment of a grantor, and his failure to reserve sufficient property to satisfy his indebtedness; inadequacy of price; unusual credit given by one in failing circumstances; secrecy in the execution of a conveyance; the fact that one involved in debt makes a conveyance to a near relation. Bump on Fraud. Con., ch. 4, ibid., p. 158. The last proposition embodies the usual but not the universal rule, however.
When a voluntary conveyance is attacked for fraud by the creditors of a donor, the burden is always upon the donor to establish the truth of circumstances that will repel the presumption of fraudulent intent, or by showing that the grantor retained other property sufficient to discharge all of his pecuniary obligations. Ibid., 286.
The possession of the wife is also prima facie the possession of the husband, and consequently raises a presumption of ownership in him, and where the wife purchases property during coverture, whether from the husband or another, the burden is upon her to show distinctly, (370) that she paid the purchase money out of her own separate estate. not with the funds furnished by her husband. Bump on Fraud. C., 318. But this Court has held that certain combinations of the several badges of fraud, already mentioned, will raise a presumption of fraudulent intent, and make it incumbent on the party benefited by the alleged fraud to show the bona fides of the transaction. Counsel for the defendant cited especially the cases of Reiger v. Davis, 67 N.C. 185;Tredwell v. Graham, 88 N.C. 208, and McCanless v. Flinchum,98 N.C. 358, in support of his position, and we propose, at a later stage of this discussion, to distinguish each of said cases from that at bar.
In applying some of the principles announced, we find that his Honor instructed the jury as to the delivery:
"Now, if the testimony satisfies you that Mrs. Brown accepted the bill of sale, and gave her husband authority to hold the property as her agent, they living together and he using the property as hers and for the benefit of the family, according to her directions, this would be a constructive delivery."
This instruction was given just after calling attention to the testimony of the plaintiff and her husband, and plainly left the recovery of *Page 289 
the plaintiff to depend upon the question, whether their evidence should show to the satisfaction of the jury that there was a constructive delivery. The onus was thus plainly thrown upon plaintiff to prove the delivery. The instruction was correct, too, as to what constituted a constructive delivery. Benjamin on Sales, sec. 1018 (and notes), 1043 and 1044; Jenkins v. Jarrett, 70 N.C. 255; Bartlett v. Blake, 37 Me. 124. The judge also left to the jury the question, whether the testimony of the husband and wife combined (there being no other evidence as to the point) had satisfied them that there was a bona fide debt due from the former to the latter, and made the right of recovery dependent upon the weight given to their testimony as to the existence of the debt. 58 Am. Dec., 775. On this point, he charged as follows:
"Was there an indebtedness by the husband to the wife? You (371) have heard the testimony of both husband and wife on this point. If they have satisfied you, by a preponderance of evidence, that there was an actual debt owing by the husband to the wife, he had a right to pay or secure the debt," etc.
He did not tell the jury that the law presumed that the deed was executed in good faith and for a fair consideration, but imposed the burden upon the plaintiff of showing a delivery, and also of establishing the consideration. The judge was not bound to adopt the language of the defendant's counsel.
He went far enough when he required the jury, as a condition precedent to find for the plaintiff, to be satisfied of the truth of the fact mentioned by him, when those facts, if true, would rebut the presumption arising out of the relation of husband and wife, that he was in possession in his own right, and that she had not paid for the property with her own funds. Indeed, it has been held by eminent authority incorrect to use the phrase "burden of proof" in such connection as suggested in the prayer for instructions. The burden of proof, it is said, never shifts, but it is always on the party having the affirmative of the issue. Theweight of evidence does sometimes shift in the progress of a trial. Greenleaf on Ev., 74, and note; Am. and En. Ev. of Law, Vol. 2, p. 655. This case cannot be made to depend on any construction given to the language used in Reiger v. Davis, 67 N.C. 185, nor upon the more decided terms used in Tredwell v. Graham, 88 N.C. 208. It differs from both in the facts, that a stranger, who was present and wrote the bill of sale, was examined in the trial, as well as the husband and wife, and there was an opportunity given to the jury, to weigh the testimony of all as to the good faith of the transaction in question. It differs from both of those cases, and also from McCanless v. Flinchum,89 N.C. 358, in another respect. The husband and wife both testified (372) that he had owed her a certain sum of money, and had paid *Page 290 
a portion, leaving still due a balance sufficient to pay, and that was used to pay an adequate price for the property described in the bill of sale. While the testimony as to the existence of the debt does not seem to be controverted by any other testimony, still the onus was put upon the plaintiff by a preponderance of testimony.
In Hodges v. Lassiter, 96 N.C. 351, Chief Justice Smith, for the Court, says: "But assuming proof, not controverted, to have been given of the indebtedness, the burden then rests on the plaintiffs, who allege, to prove fraud."
If it were not true, as it is, that our case is distinguishable fromReiger v. Davis, we will find, by referring to the language used byJustice Boyden (not to the syllabus), that the Court intended to state the rule of evidence laid down by Best in his work on the Principles of Evidence, p. 277: "Where effective proofs are in the power of a party, who refuses or neglects to produce them, that naturally raises a presumption that those proofs, if produced, would make against him." When the proofs are produced, the presumption is gone. The Court said in Reiger v. Davis, supra: "It is a rule of law, to be laid down by the Court, that when a debtor, much embarrassed, conveys property of much value to a near relative, and the transaction is secret and no oneis present to witness the trade but these near relatives, it is to beregarded as fraudulent, but when these relatives are made witnesses inthe cause, and depose to the fairness and bona fides of the transaction, and that there was no purpose of secrecy, it then becomes a question for the jury to determine the intent which influenced the parties, and to find it fraudulent or otherwise, as the evidence may satisfy them." The relatives and a stranger were introduced, and an attorney named, with whom plaintiff had consulted. The court evidently meant (373) that the question, whether the fraud was shown by the defendant to the satisfaction of the jury, would, in our case, be left to the jury. Having pointed out the distinction between our case and that ofTredwell v. Graham, supra, it, therefore, is not necessary to question the proposition that the burden of proof shifted in that case.
Abbott, in his work, Trial Evidence, pages 171 and 172, says: "It is held that, if the wife shows title to separate property or capital, not derived from him, the fact that she employs him upon it and supports him, does not raise a presumption of fraud. But his conduct in the business may be given in evidence on the question of fraud." The conduct of the husband in managing her horses and other property was given in evidence.
It is not material whether the husband gave her any written evidence of an indebtedness, and how he invested or reinvested the money, if he owed her an honest debt and agreed to pay it. George v. High, *Page 291 85 N.C. 99; Dula v. Young, 70 N.C. 450. We conclude, therefore, that the learned judge who tried the case correctly interpreted the law, when, after declaring the onus upon the plaintiff to establish the debt and prove the delivery of the property, he left the jury to determine what weight they would attach to the circumstances in the evidence that amounted to badges of fraud, and, mentioning each circumstance, especially cautioned the jury, because of the character of the evidence, to scrutinize the matter closely, and if they found that the husband executed the bill of sale with intent to hinder, delay or defraud his creditors, and that the wife participated in that intent, they would return a verdict for defendant on the first issue. Bump on Fraud. Con., ch. 4; Johnson v. McGuire, 11 Iowa 151. After establishing the debt, it was proper to tell the jury that, though the husband intended to defraud his creditors, the validity of the transfer to the wife would not be destroyed unless she participated in the intent. Battle v. Mayo, (374)post, 413. It was competent for plaintiff to show the advice of her attorney, as evidence of her good faith. Bump on F. C., 553.
There was no testimony tending to show that the bill of sale was intended as a security. On the contrary, the witnesses testified that it was a sale. We cannot see how the principle stated in Duker v. Jones, 6 Jones, 14, applies to the facts of this case. The judge was not bound to leave the question, whether the bill of sale was intended as a chattel mortgage, to the jury, merely because the plaintiff did not show affirmatively that she gave her husband a written receipt for the debt. The defendant objected to the order of the judge, allowing the pleadings to be amended, to conform to the proofs, after verdict. Superior Courts possess an inherent power to amend pleadings, and, under the provisions of The Code, have power to allow amendments, both before and after judgment. The only limitation on the power is, that no vested right shall be disturbed, and that the cause of action or defense shall not be substantially changed.Knott v. Taylor, 96 N.C. 553; Gilchrist v. Kitchin, 86 N.C. 20; Marchv. Verble, 79 N.C. 19. If the action in this case had been orginally [originally] begun and prosecuted against the sheriff individually, and not against him and his sureties on his official bond, it is obvious that the defense would have been the same made in this case, and the same issues would have arisen. The nature of the action has not been so changed as to surprise the defendant by making it necessary to establish any fact not already material under the issues submitted to the jury. The judge could, in his discretion, refuse the motion to amend or grant it, with or without terms. The Code, secs. 272, 273; Carpenter v. Huffsteller, 87 N.C. 273;Reynolds v. Smathers, 87 N.C. 24. *Page 292 
(375) We conclude, therefore, that the defendant has shown no error that entitles him to a new trial. The judgment must be affirmed.
No error. Affirmed.