## LACKETT *et al.* *v.* RUMBAUGH *et al.*

*(Circuit Court, W. D. North Carolina.* January 15, 1891.)

1. ATTACHMENT—SERVICE BY PUBLICATION—JURISDICTION.
   Where an action is commenced in a federal court against three partners, one of whom is not served, and no *alias* summons is issued, the suit as to him is at an end, and a subsequent attachment upon an affidavit of non-residence and order of publication, though authorized by the Code of North Carolina, is void, as the federal court cannot thus acquire jurisdiction without the service of process *in personam* on defendant.

2. APPEARANCE—GENERAL—JURISDICTION.
   The general appearance of defendant partner not served with process without entering any plea is not a waiver of the lack of jurisdiction of the court in respect to the subject-matter.

3. GARNISHMENT—TRUST FUNDS.
   Where partners among whom dissensions have arisen finally compromise their differences by two of them agreeing to pay the debts, releasing the third from all liability, in consideration of himself and wife conveying to the others their interest in the partnership realty and being paid $2,075 out of the insurance money for the buildings destroyed before the compromise, and the partner thus released empowers his attorney to receive the insurance money in trust for his wife, and it is paid to the attorney by the other partners on condition that it shall not be paid to the wife until she and her husband have executed the deeds according to the compromise, the fund in the hands of the attorney is a trust fund, not subject to garnishment by the partnership creditors, prior to a compliance by all of the parties with the conditions of the compromise.

4. FRAUDULENT CONVEYANCES—CONSIDERATION—WIFE'S INTEREST IN HUSBAND'S LAND.
   The insurance money was collected, and the sum agreed to be paid to the released partner was by his direction paid to an attorney for the benefit of his wife, at the urgent demand of the trustee of her separate estate who had invested part of the wife's property in the partnership realty, though she was never a partner. The consideration for transferring this fund to her was her interest in the property released to the other partners. Partnership creditors sued the firm and garnished this fund. *Held,* that it was not subject to their debts.

5. HUSBAND AND WIFE—WIFE'S SEPARATE ESTATE—TRUSTEE OF—RIGHTS.
   Where a husband and wife purchase an interest in partnership realty, the husband being a partner, but the wife not, and the cash payment is made with funds of the wife's separate equitable estate, a deed being made to the husband and to a trustee for the wife, and a mortgage for the unpaid balance given back by the grantees, which deed and mortgage are afterwards destroyed by the consent of the parties, except the trustee for the wife, and another deed is executed to the husband and wife, who give a deed of trust for the unpaid purchase money, the rights of the trustee for the wife are not affected, but he is entitled as against the husband's creditors to the latter's proportion of the insurance money arising from the destruction of the property by fire.

At Law.

This is an action at law in which a controversy has arisen between the plaintiffs and persons who have been allowed to interplead and set up title to a fund brought into the custody of the court by attachment proceedings instituted by the plaintiffs.

*Moore & Merrick, F. A. Soudley, P. A. Cummings,* and *Charles Price,* for plaintiffs.

*Cobb & Merrimon* and *Joseph S. Adams,* for interpleaders.

DICK, J. The counsel of the parties have waived a trial by jury and submitted all questions of fact to trial by the court. In performing this duty I will conform as near as I can to the principles of law and the rules of practice which have been announced by the state and federal

supreme courts in the cases *Raimond* v. *Terrebonne Parish*, 132 U. S. 192, 10 Sup. Ct. Rep. 57; *Battle* v. *Mayo*, 102 N. C. 413, 9 S. E. Rep. 384. The counsel on both sides have submitted arguments and briefs presenting statements of facts which they deem established by the evidence, and their views upon the questions of law involved. I will state my findings of facts separately, somewhat in the form of a special verdict, containing the ultimate facts presenting questions of law; and in giving my conclusions of law I will refer to the pleadings, the evidence, and the surrounding circumstances tending to prove, directly or by inference, the ultimate facts found by the investigation.

### FINDINGS OF FACTS.

(1) The defendants James H. Rumbaugh, W. W. Rollins, and Joseph Pettyjohn composed the Warm Springs Company, and were jointly indebted to the plaintiffs in the sum stated in the complaint in this action. (2) The Warm Springs Company was dissolved by the mutual consent of the partners, and upon terms expressed in a written contract executed on the 23d day of May, 1885. This contract was the result of a compromise effected by M. E. Carter, the legal counsel and mutual friend of the parties. There had been personal difficulties and much litigation between the parties, and these were all adjusted and settled by the compromise. (3) The hotel buildings and furniture belonging to the Warm Springs Company were destroyed by fire in December, 1884, and the insurance companies refused to pay any part of the insurance money until Joseph Pettyjohn, one of the insured, should sign the proof of loss, as well as the other parties insured. This Pettyjohn refused to do until some agreement should be made adjusting the claims of himself and wife as to their insured interests in the destroyed property. (4) The terms of the compromise were, in substance, that all litigation between the partners was to be discontinued, and all claims of indebtedness against Pettyjohn were to be canceled and surrendered; that he was to be relieved from all liability to creditors incurred as a partner in the Warm Springs Company; that all the indebtedness of the company was assumed and agreed to be paid by Rumbaugh and Rollins; and that he was to receive $2,500 of the insurance money, if the whole amount ($53,000) of the policies was recovered, or a proportional sum if a less amount was obtained. Pettyjohn and wife were to convey to Rumbaugh all their interest in the property of the company, and release all claims that might arise out of former joint business relations; and Pettyjohn was to assist Rumbaugh and Rollins, as far as he could, in collecting the insurance money. (5) A compromise was effected with the insurance companies, and Rumbaugh and Rollins received $44,000, and they paid to M. E. Carter $2,075, to be held by him under a power of attorney executed by Pettyjohn for the benefit of Jesse M. Pettyjohn, trustee of the separate equitable estate of Mrs. Pettyjohn. Under instructions from Rumbaugh and Rollins this fund was to be kept by M. E. Carter, and was not to become the property of Pettyjohn or to be paid over to Jesse M. Pettyjohn until Joseph Pettyjohn and wife executed the quit-

claim deed and releases agreed upon in the articles of compromise. Upon this question of fact I have not considered the *ex parte* affidavit of James H. Rumbaugh, filed six weeks after the trial in open court, in which he was not examined as a witness; as I think it is not properly admissible in reply to other evidence, and as explanatory of his written contract. (6) At the time of the dissolution of the Warm Springs Company, Joseph Pettyjohn had good reasons for believing that the promise of Rumbaugh and Rollins, to pay all the debts of the company, was made in good faith, and that they had or would have partnership assets amply sufficient and available to satisfy all creditors. (7) At the time of the destruction of the property by fire, Joseph Pettyjohn and wife were the equitable owners of a one-third interest in said property, and were entitled to a proportionate share of the insurance money, and Mrs. Pettyjohn was not a member of the company. (8) On the 30th of October, 1883, Joseph Pettyjohn and wife, Louisa B. Pettyjohn, executed a deed of trust to Henry T. Rumbaugh, conveying all of their interest in the property of the Warm Springs Company to secure a debt of James H. Rumbaugh in the sum of $22,666, evidenced by nine separate notes executed by Joseph Pettyjohn. The first note of $2,500 was to be paid on the 1st of January, 1885, and the other notes were to become due and payable in succession on the 1st day of January of each succeeding year. This deed provided that any insurance money that might become due upon destruction of the property by fire was to be applied in payment of said notes; and if the maker should fail to pay any note and interest when due, all the notes would become due and payable, and the trustee should sell the land mentioned in the deed of trust and apply the proceeds of sale in satisfaction of the debt. Mrs. Pettyjohn was not a maker or surety on the notes. (9) Joseph Pettyjohn was insolvent when he executed the power of attorney to M. E. Carter, but the same was not a voluntary conveyance, as it was induced by the urgent demands of Jesse M. Pettyjohn, trustee of the separate equitable estate of Mrs. Louisa B. Pettyjohn. It was founded upon a valuable consideration, and there was not on the part of the assignor, the trustee, or the *cestui que trust*, any intent to hinder, delay, or defraud the creditors of the Warm Springs Company. (10) That Jesse M. Pettyjohn was trustee of the separate equitable estate of Mrs. Pettyjohn, and paid to James H. Rumbaugh the sum of $8,500 of trust funds in part payment of the purchase money ($30,000) for a one-third interest in the Warm Springs property. That a deed conveying such interest was executed by James H. Rumbaugh to Joseph Pettyjohn and Jesse M. Pettyjohn, trustee of Mrs. Pettyjohn. The said grantees executed a mortgage for such interest to Rumbaugh as a security for $22,500, the balance of the purchase money. That such deed and mortgage were destroyed by Rumbaugh, with the consent of Joseph Pettyjohn and wife, and at the request of W. W. Rollins, but without the knowledge or consent of Jesse M. Pettyjohn, trustee as aforesaid. (11) The property was destroyed by fire in December, 1884. The first note of Joseph Pettyjohn ($2,500) became due on the 1st of January, 1885, and was not

promptly paid. The trustee in the deed of trust advertised the property, and in disregard of the protest of the grantors sold the same on the 9th of March, 1885, when James H. Rumbaugh became the purchaser at $8,500 cash, and the trustee on the same day executed a deed conveying the property to the purchaser. (12) M. E. Carter received, "in pursuance of a compromise" between the partners of the Warm Springs Company, the sum of $2,075, which was reduced by the payment of costs and counsel fees to the sum of $1,868; and he had that sum in hand when served with the writ of garnishment in this case.

### FACTS THAT APPEAR ON THE RECORD AND IN THE PLEADINGS.

In this case a summons was issued against all the partners of the Warm Springs Company on the 13th day of April, 1885, returnable to May Term, 1885. Service was accepted by Rumbaugh and Rollins, and no service was made upon Pettyjohn. It does not appear of record that an *alias* summons was issued against Pettyjohn at any subsequent term. The attachment proceedings were instituted and levied on the 20th day of January, 1887, by the service of process of garnishment on M. E. Carter. On an affidavit of the non-residence of Joseph Pettyjohn, an order of publication was made by the clerk of this court on the 18th day of February, 1887. The garnishee filed his answer at May term, 1887. Some time after the levy of the attachment Joseph Pettyjohn entered a general appearance by attorney. At a subsequent term the attorney asked leave to withdraw a general appearance and enter a special appearance for his client. After argument this motion was disallowed. Pettyjohn filed no pleadings to the merits of the action, and judgment was entered against all the defendants on the verdict of a jury at November term, 1888. At May term, 1887, an order was made allowing Mrs. Pettyjohn to intervene as claimant of the attached fund, and her written claim was filed on the 28th day of September, 1887. At November term, 1888, an order was entered of record making Alex. Ponnill, the regularly substituted trustee of the separate equitable estate of Mrs. Pettyjohn, a party to this controversy, and he filed his written claim to the attached fund at May term, 1889. At November term, 1889, an order was made directing M. E. Carter, the garnishee, to file a bill of interpleader on the equity side of the court, making as parties all the claimants of the fund in his hands. The garnishee has not complied with this order, but he now submits all his rights to the determination of the court at this trial.

### CONCLUSIONS OF LAW.

The proceeding of garnishment is in the nature of a civil suit, as it may result in a judgment for or against the garnishee. The form of proceeding is regulated by local state laws. The garnishee must have a day in court, and he can make any defense to which he may be entitled against the debtor in the main action. In his answer he is not limited to a statement of facts within his own knowledge, but may answer on information and belief. The answer is his defense, and he may set out

extrinsic facts which he may suppose relevant to his liability. Drake, Attachm. § 626. The answer of a garnishee is regarded as analogous to an answer in chancery, and it is to be taken as true unless controverted by evidence. He is presumed to be an innocent party, and to stand indifferent as to who shall have the money or property in his hands. If he has demeaned himself correctly he is entitled to his costs, counsel fees, and reasonable compensation as custodian. He is not liable for interest unless he has received interest, or used the fund, or mingled it with his own money. His appearance and answer places the fund in his hands *in custodia legis*, and subjects him to the orders of the court in reference to such fund, and in obeying such orders he is under the protection of the law. *Mattingly* v. *Boyd*, 20 How. 128; *Habich* v. *Folger*, 20 Wall. 1. The answer of the garnishee in this case is full, direct, and positive as to the facts and circumstances attending his receipt of the fund, and the directions and trusts imposed upon him by the parties interested; and I have regarded his statements as true, as they have not been controverted by the evidence, and were substantially affirmed by his testimony at the trial. He was the legal counsel and agent of the Warm Springs Company in effecting a compromise of the disputes and litigations of the partners. He collected for them the $44,000 of insurance money, in which all the partners had an interest. On the same day that the articles of compromise were signed, he accepted in writing a power, coupled with a trust, from Pettyjohn, to receive and transmit to Jesse M. Pettyjohn, trustee of Mrs. Pettyjohn, the part of the insurance money due Joseph Pettyjohn under the terms of the compromise. Some time afterwards Rumbaugh and Rollins paid him the sum of $2,075, and directed him to hold the money until Pettyjohn should comply with his engagements in the articles of compromise. At the time of his answer to the garnishment he had in his hands $1,868, subject to be applied in compliance with the articles of compromise, and with the terms of the express trust which he had accepted. The principal cause of controversy between the partners seems to have been the claim of Pettyjohn and wife for their part of the insurance money, and this contention had delayed payment on the part of the insurance companies. The garnishee says in his answer:

"The said defendant and his wife were at this time claiming that the sale of the trustee was void, and that any money that might be received from the insurance company ought to be applied on the purchase money due for said one-third interest. At this juncture this garnishee effected a compromise between the said parties by which said Rollins and Rumbaugh agreed to pay said Pettyjohn, or such person as he might designate," the sum agreed upon.

The answer also says:

"This garnishee received said sum in pursuance of a compromise between the defendant Pettyjohn on the one side and Rollins and Rumbaugh on the other, of a controversy growing out of their joint ownership and management of the said hotel property."

A fair, reasonable, and just construction of the contract of the parties, and of the answer of the garnishee who adjusted the contentions, clearly

shows that the insurance money to be received by the garnishee for Mrs. Pettyjohn was the primary consideration of the compromise, well understood and assented to by all the parties. The plaintiffs claim the right to have the fund in the hands of the garnishee applied in payment of their judgment against Joseph Pettyjohn, as they had acquired a lien by virtue of their attachment proceedings. The interpleaders claim the fund as rightful owners under the trust declared in the power of attorney executed on the day of the compromise by Joseph Pettyjohn with the approval of his copartners, and nearly two years before the service of the garnishment on their trustee, M. E. Carter.

There are several grounds upon which the relief claimed by the plaintiffs must be denied. A garnishee is not liable to a judgment against him when he holds a fund to which the debtor in the main action will not be entitled until he performs a precedent condition, and that condition is unfulfilled. The partners of the Warm Springs Company adjusted their controversies by a compromise deed which appears to have been executed in good faith, and with a full understanding as to their respective rights. The covenants in such deed are clearly mutual and dependent; they were made at the same time; they relate to the same subjects-matter, and were intended to effectuate reciprocal obligations. Among other things, Rumbaugh and Rollins assumed the payment of the debts of the company, and agreed to save Pettyjohn harmless of any liability to partnership creditors. Pettyjohn, on his part, agreed that he and his wife would execute the specified deed and releases, and upon so doing he was to receive a certain portion of the insurance money when recovered. It seems from the evidence that both parties to the compromise deed are in default as to each other, and neither have acquired the definite rights of action that would accrue to either upon performance or offer to perform his obligation. *Hyde* v. *Booraem,* 16 Pet. 169; *Phillips* v. *Seymour,* 91 U. S. 646–650. At the time when the garnishment was served on M. E. Carter, the precedent condition had not been performed by Pettyjohn. He had no absolute title to the money; no right of action; and all his claim to the fund had been transferred, and he had no further power to control its disposition. The validity of an attachment depends upon the state of facts existing at the time when levied. It cannot reach any liability of the garnishee accruing after the service of the process upon him. *Devries* v. *Summit,* 86 N. C. 126. An attaching creditor cannot acquire any higher or better right to the property attached than the defendant in the main action had when the process was levied, unless he can show some fraud and collusion by which his rights were attempted to be impaired. 7 Lawson Rights, Rem. & Pr. §§ 3610–3617; *Black* v. *Zacharie,* 3 How. 483–513. A garnishee has a right to insist upon any defense which he could have made against the defendant in the main action. *McLaughlin* v. *Swann,* 18 How. 217; *Schuler* v. *Israel,* 120 U. S. 506, 7 Sup. Ct. Rep. 648. He may also show that the attachment proceedings are void, as a judgment thereon would not protect him against a rightful claimant. *Houston* v. *Porter,* 10 Ired. 174.

The next objection to the claim of the plaintiffs is that trust funds are not subject to garnishment until the trustee has executed the trust and there is an adjusted balance not needed for the purposes of the trust, and for which a party entitled could rightfully bring an action at law. *McLaughlin* v. *Swann, supra.* The trustee of an active, unexecuted trust is suable alone in equity. This is an old and well-established principle of equity jurisprudence, undisputed in courts of common law. A trustee is only liable to an action at law when he has incurred a personal responsibility, or completed his trust. A judgment at law against a trustee in such special capacity is utterly unknown. A trustee is not an agent, but a person in whom some estate, interest, or power, in or affecting property, is vested for the benefit of another, and the *cestui que trust* acquires an equitable estate which will be under the exclusive jurisdiction of a court of equity. *Taylor* v. *Mayo*, 110 U. S. 330–336, 4 Sup. Ct. Rep. 147; *Haust* v. *Burgess*, 4 Hughes, 560; 2 Story, Eq. Jur. § 975a; 2 Perry, Trusts, § 488. In the case before us the fund came into the hands of the garnishee under a power coupled with a trust, accepted and still unexecuted. When the garnishee accepted this express trust he assumed duties and acquired rights of which he cannot be relieved or divested by an action at law. The garnishment served upon him is a nullity, as the instrument creating the trust is not void in law upon its face, and there is not the slightest evidence that the trustee had any fraudulent intent or purpose in accepting the trust. The principles above announced were fully recognized in this state when there existed separate courts of law and equity, and are still observed under our Code system. *Coffield* v. *Collins*, 4 Ired. 486; *Fertilizer Co.* v. *Reams*, 105. N. C. 283, 11 S. E. Rep. 467. The Code system adopted in this state abolished the distinction between actions at law and suits in equity, and the forms of all such actions and suits, and conferred upon the state courts jurisdiction to administer in a civil action such remedies and relief as the pleadings and evidence in a case required. The long-established, essential, and characteristic differences between legal and equitable rights and principles were not abolished by the Code; and the state courts, in administering justice, carefully observe these distinctions in enforcing rights, and in the adjustment of appropriate remedies. These elementary principles of law and equity were developed by centuries of parallel and distinctive growth, and still have an harmonious co-existence in English and American jurisprudence.

There is still another fatal difficulty in the way of the plaintiffs in sustaining a lien by virtue of their attachment proceedings. Under the Code system adopted in this state the foreign attachment, as an original proceeding commencing an action and acquiring a lien, is not allowable. The warrant of attachment is only a provisional or ancillary remedy in and dependent upon a main action commenced by the issuing of a summons. Code N. C. § 348; *Marsh* v. *Williams*, 63 N. C. 371; *Toms* v. *Warson*, 66 N. C. 417. The provision of the Code authorizing the attachment of the property of a non-resident defendant upon constructive service of a summons by publication has

many of the features of the foreign attachment. Such proceeding is an extraordinary and summary remedy, and is in derogation of the common law and the statute law of the United States, and cannot be recognized in a case commenced in a federal court. Even in a state court the plaintiff must strictly and technically perform all the conditions required by the statute entitling him to such remedy. Jurisdiction in such cases cannot be acquired or enlarged by implication and liberal construction. *Thatcher* v. *Powell*, 6 Wheat. 119; *Askew* v. *Stevenson*, Phil. (N. C.) 288. The acts of congress, in adopting for federal courts the practice, pleadings, and forms and modes of procedure that prevail in the state courts, were not intended to enlarge the jurisdiction of United States courts, or to give force and validity to state proceedings in conflict with the laws of the United States. State laws can confer no authority on a federal court to extend its jurisdiction over persons or property in any manner that is in contravention of national laws. The jurisdiction of United States courts depends exclusively on the constitution and laws of the United States, and they cannot resort to state laws or the common law as sources of jurisdiction further than is expressly provided by acts of congress. In actions commenced in federal courts, section 915, Rev. St. U. S., was intended only to apply to the ancillary warrant of attachment when issued and levied upon the property of a non-resident defendant after he had been properly served with process *in personam,* or had made a general appearance and pleaded to the merits of the action. *Ex parte Railway Co.*, 103 U. S. 794; *Chittenden* v. *Darden,* 29 Myer's Fed. Dec. § 447. In the case of *Pennoyer* v. *Neff,* 95 U. S. 714, 727, the doctrine is distinctly announced that constructive service by publication is allowable in actions commenced in federal courts which are substantially proceedings *in rem.* "But when the entire object of the action is to determine the personal rights and obligations of the defendants,—that is, where the suit is merely *in personam,*—constructive service in this form upon a non-resident is ineffectual for any purpose." In this case it is unnecessary to refer at length to the distinctions between actions begun in the federal courts and attachment suits removed from state courts. Such distinctions are clearly defined, and the authorities are reviewed in *U. S.* v. *Ottman,* 11 Myer's Fed. Dec. § 1638. The doctrines announced in *Wheeler* v. *Cobb,* 75 N. C. 21, and in similar cases, are good law when applied to cases commenced in state courts. In the case of *Hart* v. *Sansom,* 110 U. S. 151–155, 3 Sup. Ct. Rep. 586, the court says:

"The courts of the state might, perhaps, feel bound to give effect to the service made or directed by its statutes; but no court deriving its authority from another government will recognize a merely constructive service as bringing the person within the jurisdiction of the court."

There is an objection to these attachment proceedings that would be fatal in the courts of this state. The summons was not served before the return-day, and it does not appear of record that an *alias* summons was issued to continue the action. When a summons has been returned unexecuted, *alias* and *pluries* writs of summons must be issued, from

time to time, to preserve the continuance of the action, and these facts must appear of record. The omission in this case amounted to a discontinuance of the action. A discontinuance is somewhat similar to a nonsuit. The plaintiffs could only further prosecute their claim against the defendant by the commencement of a new action. 3 Bl. Comm. 296; *Hanna* v. *Ingram*, 8 Jones, (N. C.) 55. An ancillary warrant of attachment, when there is no summons commencing the action, is a nullity. When the court has jurisdiction of the subject-matter the consent of a defendant can give jurisdiction over his person in a particular pending action, and this consent may be made by an appearance of record, or may be inferred by his pleading to the complaint filed. *Greer* v. *Cagle*, 84 N. C. 385; *Railroad Co.* v. *Ketchum*, 101 U. S. 289. The general appearance of the defendant by attorney was subsequent to the attachment proceedings. No express waiver of a want of summons appears of record, and there was no pleading to the complaint. The general appearance of defendant waived his personal privilege of being sued only in his own district, and it would have waived defect of merely irregular process, if any had been issued; but it does not and cannot waive matters relating to the jurisdictional power of the court. *Houston* v. *Porter, supra; Creighton* v. *Kehr*, 20 Wall. 8; *Harkness* v. *Hyde*, 98 U. S. 476; Cooley, Const. Lim. 378. When the defendant entered an appearance he by implied consent became a party, at that time, to the pending action. His appearance was merely equivalent to the service of process to commence a new action, and did not by relation revive a suit that the law had determined to be at an end. Jurisdiction generally operates for present and prospective purposes, and only in a few instances has a retroactive effect. A court may at a subsequent term, by a *nunc pro tunc* order, amend its records so as to make them speak the truth, and may allow amendments of mere irregularities or mistakes in proceedings over which it had jurisdiction, but cannot supply a want of jurisdiction as to previous action. Even a legislative statute cannot make valid the proceedings of a court which were void for want of jurisdiction over the parties. Cooley, Const. Lim. 107, 283. In issuing the warrant of attachment in this case, and making an order of publication to give validity to the proceedings, the clerk acted without authority of law, and contrary to law.

When jurisdiction for doing an act in judicial proceedings does not exist at the time the act is done, such act is void for all purposes, and no subsequent occurrence or acquiescence will give it validity. As there was a total want of jurisdiction all the attachment proceedings in this case are nullities. They conferred no rights, and must be disregarded in determining the questions involved in this controversy. *Hart* v. *Sansom, supra*, and cases cited; *Spillman* v. *Williams*, 91 N. C. 483; *Rogers* v. *Jenkins*, 98 N. C. 129. The opinions which I have expressed are in harmony with the principles announced in *Toland* v. *Sprague*, 12 Pet. 300, and often reaffirmed in many subsequent cases. In that case the court did not consider the question as to the force and effect of the attachment proceedings, as they were regarded as dissolved when the

defendant appeared and pleaded in bar to the declaration filed by the plaintiff. The doctrines announced in the cases of *Cooper* v. *Reynolds*, 10 Wall. 308, *Maxwell* v. *Stewart*, 22 Wall. 77, and other similar cases, apply to actions commenced in state courts and under local statutes. Every state has a right to confer jurisdiction upon its courts over all property within its territorial limits, and to apply and enforce such remedies as may be deemed appropriate by the legislative will. If a suit is properly commenced in a state court, and be rightfully removed to a federal court, such court has jurisdiction to enforce all acquired liens, and to administer such remedies as the state court could and would have done if it had retained jurisdiction of the action.

There is still another objection insisted upon by the counsel of the interpleaders. It appears from the record that the judgment of the plaintiffs against Joseph Pettyjohn is erroneous, in that it was rendered upon the verdict of a jury, upon issues of fact submitted when there was no plea or answer filed by this defendant. At common law, and under the state Code, issues of fact to be tried by a jury arise when, in the course of affirmative and negative pleadings, a material fact is maintained by one party and controverted by the other. Code N. C. § 391; *Chapman* v. *Barney*, 129 U. S. 677, 9 Sup. Ct. Rep. 426. The judgment, although irregular and erroneous, is not void, as the court had jurisdiction of the subject-matter, and the person of the defendant. It is for a just debt which the plaintiffs have against the defendant, and I am of opinion that it would not be reversed in a court of error. I will regard the judgment as valid for the purposes of this controversy. *Knott* v. *Taylor*, 99 N. C. 511, 6 S. E. Rep. 788; *Brobst* v. *Brock*, 10 Wall. 519; *Brooklyn* v. *Insurance Co.*, 99 U. S. 362; *Railway Co.* v. *Ross*, 112 U. S. 377–395, 5 Sup. Ct. Rep. 184. As the fund in controversy has been brought into the custody of the court under color of process, and controversy has arisen between parties before the court asserting conflicting claims, the court has jurisdiction to consider both the legal and equitable rights of the adverse claimants, and administer justice between them, either in this action at law, or by an appropriate ancillary suit on the equity side of the docket. The intervention on the part of the interpleaders is in the nature of a bill of interpleader, which is allowable in equity where a party in interest desires to establish his own rights, when there are conflicting rights claimed by other parties and the relief sought is equitable relief. *Killian* v. *Ebbinghaus*, 110 U. S. 568, 4 Sup. Ct. Rep. 232; *Walter* v. *Bickham*, 122 U. S. 320, 7 Sup. Ct. Rep. 1197; *Gumbel* v. *Pitkin*, 124 U. S. 131, 8 Sup. Ct. Rep. 379.

If, upon obtaining judgment, the plaintiffs had seen proper to abandon their void attachment, and resorted to proceedings supplementary to execution, they could not have reached the fund in the hands of the garnishee. *Fertilizer Co.* v. *Reams*, 105 N. C. 283, 11 S. E. Rep. 467. As such proceedings are provided for in the state Code they are allowable in this court for the purpose of discovery, (*Ex parte Boyd*, 105 U. S. 647,) but certainly would not be allowed a wider operation than is given to them in the courts of this state.

We will now proceed to inquire whether the plaintiffs have any equitable rights to the fund in the custody of the court. As partnership creditors they have no independent right to have partnership assets applied in discharge of their debt in preference to the debts of individual creditors. The rights of partnership creditors to have such preference over individual creditors are equitable and derivative. They have no independent lien on such assets, but their rights are secured and enforced in a court of equitable jurisdiction by subrogation to the equitable rights of the partners. Even after the dissolution of a firm the specific lien of the partners continues for their indemnity as to partnership debts, and to realize their shares of the surplus. They may relinquish these rights to one and the others; and when their rights *inter sese* are gone, the rights of partnership creditors, as such, are gone, and they stand in the same position as individual creditors. In this case Joseph Pettyjohn was released by Rumbaugh and Rollins from all joint liability with them for partnership debts; and they assumed the payment of such debts, and also expressly conferred on Pettyjohn the right, as to themselves, to apply the amount of partnership assets received by him to the payment of an individual debt. *Allen* v. *Grissom*, 90 N. C. 90; *Stout* v. *McNeill*, 98 N. C. 1, 3 S. E. Rep. 915; *Huiskamp* v. *Wagon Co.*, 121 U. S. 310, 7 Sup. Ct. Rep. 899, and cases cited. Even if the Warm Springs Company was insolvent at the time of the compromise between the partners, that condition of affairs did not deprive them of their control over their property, and prevent them from making the agreement to apply a portion of the joint assets to such purpose as Pettyjohn might designate. There is no evidence showing that the agreement between the partners was made to hinder, delay, and defraud creditors. The evidence tends to show that Rumbaugh and Rollins assumed in good faith the partnership debts, and honestly expected to discharge all such liabilities. It is not within the scope of my duty to investigate the circumstances of the compromise transaction further than is disclosed by the evidence relevant to this controversy before us for determination. The assets of the company seem to have been largely in excess of the partnership debts, but there may be facts and circumstances which I do not understand, and I will make no useless conjectures as to why the debts were not paid. As to creditors, the compromise between the partners of the Warm Springs Company did not free Pettyjohn from his individual liability to pay the firm debts. A debtor cannot make a voluntary conveyance which will be valid against creditors unless he retains property amply sufficient and available to pay all his creditors. The property retained must be in such condition that the creditors can reach it by the regular process of law. The fact that a debtor has made arrangements with solvent persons to pay his debts will not be sufficient to make valid a voluntary conveyance unless such debts are paid. Such arrangement is, however, evidence upon the question of want of fraudulent intent, where a debtor insists that his conveyance is not voluntary, but was made upon a valuable consideration. *Worthy* v. *Brady*, 91 N. C. 265. At the common law and under the laws of this state an insolvent debtor may dispose of

his property, or may prefer one of his creditors, if he does so without any fraudulent intent. *Cannon* v. *Young*, 89 N. C. 264. A conveyance is not void under the statute of 13 Elizabeth, even though its effect may be to hinder, delay, or defraud creditors, if it be not made with an act-ual intent to do so. It is the intent and purpose existing in the mind of the insolvent debtor at the time of making the assignment to delay, hinder, defraud, and defeat his creditors that vitiates his assignment and makes it void. Even if such fraud exists in the mind of the grantor, and the conveyance is absolute, the grantee must participate in the fraud before he can be deprived of his rights under the conveyance. *Beasley* v. *Bray*, 98 N. C. 266, 3 S. E. Rep. 497, and cases cited; *Brown* v. *Mitchell*, 102 N. C. 347, 9 S. E. Rep. 702.

I will now briefly refer to the evidence to see whether there are any of the usual elements and badges of fraud in the conveyance which has been attacked by the plaintiffs. There is not the slightest evidence that M. E. Carter or Jesse M. Pettyjohn had knowledge of or participated in any fraud. The very decided preponderance of the evidence tends to show that Joseph Pettyjohn had no fraudulent intent or purpose to de-feat the debt of the plaintiffs. He rather showed a disposition to pro-vide for and secure payment. By the terms of the compromise with his partners he agreed to convey all the legal and equitable rights of him-self and wife in the large sum of insurance money and the other personal property of the company, and execute a quitclaim deed for their interest in 150 acres of land on which were situated very valuable and famous medicinal springs. This insurance money and land, by a fair estimate, were worth $70,000; and the partnership debts, as they appear of rec-ord by judgments in this court, amount to about $10,000. One of the principal considerations of the compromise was that the partnership debts should be paid, and he had good reason to believe that his part-ners had the disposition and ample means to pay such debts, and would promptly perform their obligations solemnly assumed. The assignment to Carter bears on its face no evidence of fraud. I deem it unnecessary to consider the question whether the assignment was fraudulent in law upon the ground that Joseph Pettyjohn was insolvent, and did not re-tain property sufficient and available to pay his existing debts; for I am of opinion that the evidence shows that the assignment was not volun-tary, but was made upon the urgent solicitations and demand of Jesse M. Pettyjohn, who had a large and *bona fide* claim and interest which was obligatory upon all the partners of the Warm Springs Company. There was no secrecy about the transaction, as it was a part of the set-tlement of the litigated affairs of the Warm Springs Company, about which there had been much consultation with eminent lawyers. Upon full consideration of all the facts and circumstances disclosed by the ev-idence in this case, and after careful examination of many authorities upon the questions of law involved, I am of the opinion that the plain-tiffs are not entitled, either in law or equity, to the fund in controversy.

I will now proceed to consider the rights of the interpleaders as they appear in their petitions and the evidence. They occupy the position

of actors, and upon them is the burden of proving title to the property they claim. *Wallace* v. *Robeson*, 100 N. C. 206, 6 S. E. Rep. 650; *McLean* v. *Douglass*, 6 Ired. 233. If the attachment proceedings were merely irregular they would have no right to contest that matter. *Blair* v. *Puryear*, 87 N. C. 101. But they have a right to insist that such proceedings are null and void, that the property levied on was not liable in law to attachment, and they can set up a legal or equitable title superior to that of the plaintiff in the main action. In this case the rights of Mrs. Pettyjohn arising out of her statutory separate estate are not directly involved. Such separate estate was under her control, and she could dispose of it as she pleased with the consent of her husband. The assignment to Carter was not made directly to her, but to Jesse M. Pettyjohn, the trustee of her separate equitable estate. The effects of such estate could not be changed, disposed of, or incumbered by her except with the consent of her husband and the concurrence of her trustee. *Knox* v. *Jordan*, 5 Jones, Eq. 175; *Cooper* v. *Landis*, 75 N. C. 526; *Hardy* v. *Holly*, 84 N. C. 661. I am of opinion that the assignment to Carter could be sustained if it had been made directly to Mrs. Pettyjohn as the immediate *cestui que trust*. She had a valuable legal and equitable estate in the insurance money and lands of the Warm Springs Company at the time of the destruction of the hotel by fire. The evidence shows that Rumbaugh conveyed a one-third interest in said property to Joseph Pettyjohn and Mrs. Pettyjohn. At the common law, and by the laws of this state, where lands are conveyed to husband and wife they hold by entireties, and the right of survivorship will prevail over any attempted alienation by the husband. *Hunt* v. *Blackburn*, 128 U. S. 464, 9 Sup. Ct. Rep. 125; *Simonton* v. *Cornelius*, 98 N. C. 433, 4 S. E. Rep. 38. From the face of the deed of trust executed by Pettyjohn and wife, dated October 30, 1883, it appears that the grantors conveyed their joint interest in the Warm Springs lands and property to Henry T. Rumbaugh, trustee, to secure the payment of nine promissory notes made by Pettyjohn to James H. Rumbaugh. Mrs. Pettyjohn did not sign said notes as surety, but by conveying her estate in the real property to secure the individual debts of her husband she became substantially a surety to the notes. A surety is entitled to the benefits of all securities which the creditor acquires from the principal debtor; and if the creditor prevents or misapplies such securities to the prejudice of the surety, he thereby discharges the surety *pro tanto*. *Purvis* v. *Carstaphan*, 73 N. C. 575. Mrs. Pettyjohn was entitled to have had the insurance money due the owners of the property applied in payment of her husband's debts, as provided in the deed of trust, before the mortgaged land was sold, so as to relieve her estate to that extent, and furnish her an opportunity of relieving the incumbrance thus reduced in amount. The sale of her land to pay her husband's debts certainly made her a *bona fide* creditor of her husband to the extent of her interest, and she had a right to call upon him to repay such amount. The land sold for $8,500 in cash, and her husband justly owed her half that amount, as she had an equal interest in the property. Even a conveyance by a wife of her in-

choate dower interest in the lands of her husband constitutes a valuable consideration for a conveyance made to her by her husband. *Brown* v. *Mitchell, supra; Battle* v. *Mayo, supra; Gore* v. *Townsend,* 105 N. C. 228, 11 S. E. Rep. 160; *Sykes* v. *Chadwick,* 18 Wall. 141; *Bean* v. *Patterson,* 122 U. S. 496, 7 Sup. Ct. Rep. 1298. Mrs. Pettyjohn was also entitled to have the land sold by the trustee in a manner and under circumstances that would make the property realize the highest price. From the face of the deed of trust it appears that there were nine notes executed by the husband to Rumbaugh,—one payable on the 1st of January, in eight successive years. Only one note of $2,500 was due at the time of sale by the trustee. The most valuable and productive part of the property for which the notes were given had been destroyed by fire a few days before this note was due. Mrs. Pettyjohn insisted that the insurance money should be collected and applied as directed in the deed of trust. In a month after this note was due the trustee advertised the property for sale, when the embers of the smouldering ruins had but recently gone out. The rights of the parties in interest were in dispute, the validity of the sale was questioned, and all persons who might be disposed to purchase an undivided interest would naturally be deterred by pending and threatened litigation and doubtful title. Even under these adverse circumstances the third interest of Pettyjohn and wife brought $8,500 in cash, and James H. Rumbaugh became the purchaser. From these facts appearing in the evidence, oral and documentary, the demands of Pettyjohn and wife to have the sale postponed, and the terms of the deed of trust complied with, seem to have been just and reasonable.

As these questions of fact are not now before me for full investigation and decision, I will express no further opinion as to their character and consequences; but I will state a principle of law founded in common fairness and justice, and fully recognized in courts of equity:

"Sales under powers in deeds of trust or mortgages are a harsh mode of foreclosing the rights of mortgagors. They are scrutinized by courts with great care, and will not be sustained unless conducted with great fairness, regularity, and scrupulous integrity. Upon very slight proof of fraud or unfair conduct, or any departure from the terms of the power, they will be set aside. If proper notices of the sale are not given, or if the proceedings are in any way contrary to justice and equity, the sale will not be allowed to stand." 2 Perry, Trusts, § 602*x; McLeod* v. *Bullard,* 86 N. C. 210; *Fairfax* v. *Hopkins,* 9 Myer's Fed. Dec. § 1173; *Bronson* v. *Kinzie,* 1 How. 311–321.

Under the circumstances of this case it seems that James H. Rumbaugh had sufficient reasons for making a compromise with Pettyjohn and wife for the purpose of removing clouds from his title which might seriously affect the title of subsequent purchasers who had notice of the transaction, or who had the opportunity of notice in investigating the chain of title to the property. *Johnson* v. *Prairie,* 91 N. C. 159. Reference is made to these facts in this connection for the purpose of showing that Mrs. Pettyjohn had valuable rights in the property of the Warm Springs Company at the time of the assignment to M. E. Carter, and that her agreement to release and convey such rights to Rumbaugh con-

stituted a *bona fide* consideration, and was not fraudulent as to creditors, as she was in no way liable to creditors, as she was not a member of the firm. The assignment which we are considering was made for the benefit of Jesse M. Pettyjohn, trustee of the separate equitable estate of Louisa B. Pettyjohn, and we will now inquire as to his right to the fund assigned. The evidence shows that he paid $8,500 of trust funds in part payment of the purchase money of one-third interest in the Warm Springs property. A deed was made by the vendor, James H. Rumbaugh, to Joseph and Jesse Pettyjohn, trustee as aforesaid, conveying such one-third interest, and a mortgage was subsequently made by the vendees to the vendor to secure balance of purchase money. By consent of Joseph Pettyjohn and wife, and upon the request of W. W. Rollins, the deed and mortgage were destroyed by Rumbaugh; and this same one-third interest was conveyed to Pettyjohn and wife, and they executed a deed of trust to Henry T. Rumbaugh, as trustee, to secure the payment of the individual notes of Joseph Pettyjohn for balance of purchase money. The declared purpose and object of all the parties concerned in the destruction of the deed to Jesse M. Pettyjohn, trustee, was to free the property from the feature of an equitable separate estate in Mrs. Pettyjohn, so as to make the property more available for raising money on a mortgage to be made by the Warm Springs Company. All of these transactions were without the knowledge or consent of Jesse M. Pettyjohn, and were never afterwards approved by him. Under the unregistered and destroyed deed he acquired an equitable estate and an incomplete legal title to the property. As he never assented to the destruction of this deed, he had, and his regularly substituted successor, Alex. Pannell, now has, a clear right in equity to have such deed re-executed, or to have the trust fund advanced in the purchase restored, with interest. *Phifer* v. *Barnhart*, 88 N. C. 333; *Edwards* v. *Dickinson*, 102 N. C. 519, 9 S. E. Rep. 456; Perry, Trusts, §§ 181, 183, 842. This equity exists against all the partners of the Warm Springs Company, as they all participated in the illegal and wrongful transaction. They are, in contemplation of a court of equity, constructive trustees. A constructive trust, as distinguished from both express and implied trusts, is a trust which is raised by construction of equity, without reference to any intention of the parties, either expressed or presumed. Snell, Eq. 128; *Walden* v. *Skinner*, 101 U. S. 577. The jurisdiction of courts of equity to follow trust funds, and to mould and apply remedies to suit the rights of parties, and to administer justice by proper relief, is settled by numerous and uniform decisions. 2 Story, Eq. Jur. § 1210; *McEachin* v. *Stewart*, 106 N. C. 336, 11 S. E. Rep. 274, and cases cited; Perry, Trusts, § 346; *May* v. *Le Claire*, 11 Wall. 217. In the case *National Bank* v. *Insurance Co.*, 104 U. S. 54–67, we find the rule of courts of equity in England stated and approved:

"It is, I apprehend, an undoubted principle of the court that as between *cestui que trust* and all persons claiming under the trustee, otherwise than by purchase for valuable consideration without notice, all property belonging to

a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or its altered state, continues to be subject to or affected by the trust."

All the partners of the Warm Springs Company were, in contemplation of a court of equity, trustees, as to the money paid by Jesse M. Pettyjohn, for the property, as they all participated in the destruction of his unregistered deed. When trustees insure trust property, and such property is entirely destroyed by fire, the *cestui que trust* is entitled to a proportionate interest in the insurance money. Perry, Trusts, §§ 487–553. As Jesse M. Pettyjohn had an equitable estate in the property insured, and was not a member of the company, his rights were superior to those of the creditors of the firm, and there could be no fraud in the partners in allowing him to receive the proceeds of his own property upon which creditors had no just claim. There can be no reasonable doubt as to the fact that Jesse M. Pettyjohn, as trustee for Mrs. Pettyjohn, paid the sum of $8,500 of trust funds for the property, and that Rumbaugh executed a deed for the same. Where a deed is lost or destroyed there is no question its loss and contents may be proved by secondary evidence,— by a copy, if there is one; but if none, then parol evidence of its contents may be given. *Cowles* v. *Hardin*, 91 N. C. 231. There seem to have been only four persons who were cognizant of the transaction. Pettyjohn and wife, in their depositions, state the facts positively and directly, and their evidence is sustained by documentary proofs. W. W. Rollins was a witness for the plaintiffs on the trial, and his testimony did not controvert the fact. James H. Rumbaugh was present at the trial, and he was not introduced as a witness. The rule of evidence is well settled in this state:

"When effective proofs are in the power of a party who refuses or neglects to produce them, that naturally raises a presumption that those proofs, if produced, would make against him." *Brown* v. *Mitchell*, 102 N. C. 347–372, 9 S. E. Rep. 702.

The consent and other acts of Mrs. Pettyjohn, in connection with the destruction of the unregistered deed of her trustee, and the fact that she accepted another deed for the same property, and conveyed her interest thus acquired in the deed of trust to H. T. Rumbaugh, in no way prejudices her rights under her separate equitable estate. In regard to such estate she could do no act without the concurrence of her trustee that would bind her, or would operate as an estoppel, and being a married woman no presumptions of fraud could arise out of her contracts. *Cooper* v. *Landis, supra; Hardy* v. *Holly, supra; Bank of America* v. *Banks*, 101 U. S. 240; *Farthing* v. *Shields*, 106 N. C. 289, 10 S. E. Rep. 998. From the terms of compromise between the partners of the Warm Springs Company, and from the proofs of attendant facts and circumstances, we may well presume that it was entered into in a spirit of peace, and for the settlement of litigated contentions and unadjusted demands on both sides. Rumbaugh and Rollins are men of good character, and had apparent means amply sufficient to discharge their assumed obligations. The instrument on its face manifests no intent to hinder, delay, or de-

fraud creditors. The compromise was effected by a lawyer of high character, ability, and learning, who in his answer as garnishee, and in his testimony on the trial, gave full information on the subject. The trustee of the separate equitable estate of Mrs. Pettyjohn had a right to demand a part of the insurance money that was an indemnity for the general loss, as it was his property, and was in no way liable to the creditors of the company. I will express no further opinion as to the justness and fairness of the compromise. The parties well understood their rights and interests, as they had consulted eminent counsel.

It appears from the evidence that the interpleaders have not complied with the reciprocal conditions expressed in the compromise. They have no immediate rights to the relief which they pray. I can control the fund until the compromise can be fully carried out under the orders and decrees of this court. My action will be governed by the principles of law and equity announced by the supreme court of the United States in the case of *Gumbel* v. *Pitkin*, 124 U. S. 131, 8 Sup. Ct. Rep. 379. That case, sustained by the authorities cited, shows the inherent power of courts of equity to mould and adjust their elastic, flexible, and efficient modes of procedure for the purpose of administering substantial justice. In that case it appears that the property was seized by the marshal under an illegal warrant of attachment regular on its face, and it was held by the court that jurisdiction had been acquired under color of its authority, and that the court could dispose of the property thus brought into its custody, and decide all questions of conflicting rights. The rights of claimants were recognized who had acquired no lien upon the property in custody of the court, but were prevented from acquiring a lien by the closely guarded custody of the marshal. The plaintiffs who had caused the seizure under void warrants of attachment abandoned and discontinued their proceedings; but still the supreme court says, in substance, that United States circuit courts, sitting as courts of law, have inherent equitable powers as extensive and efficient as may be required by the necessity for their exercise, and may be invoked by strangers to the litigation as incident to the jurisdiction already vested, or to property brought within their custody by color of the authority of their process, all persons interested being before the court. The interpleaders have clearly established their right to the fund in controversy, but they are not at present entitled to a decree to have the same paid over to them by the garnishee. As Rumbaugh and Rollins have both filed affidavits in this case, in which they manifest a willingness to relieve Pettyjohn and wife from the obligation to execute a quitclaim deed and releases, I suppose there will be no difficulty in making a speedy and satisfactory adjustment. The counsel of the interpleaders may draw an order directing the garnishee to pay the fund in his hands into the registry of the court, and the questions as to his liability as to interest on the fund, and as to his right to costs, counsel fees, and compensation as custodian, will hereafter be determined. The interpleaders will be entitled to judgment for their costs in these proceedings, to be taxed against the plaintiffs in the

main action, excepting the costs of the garnishee. The balance of the costs will be taxed against the defendants in the main action. The garnishee's costs will be paid out of the fund in his hands.